There are a number of significant issues, I believe, before the Court, and I would like to start with addressing the Mount Healthy issue, which I believe is a significant issue in this case. I would ask you a preliminary question because I'm a little confused, a lot confused at the time. But in this case, there was a special verdict. Verdict under which the jury found there was no retaliation for discriminatory or discriminatory issues for the report. Yes. Well, it's actually a retaliatory issue, but yes. That being the case, why does the correctness of the Pickering analysis or the Mt. Healthy analysis make any difference? Well, Your Honor, it seems to me this case ultimately gets back to whether his results of what I believe are evidentiary errors on the case. I understand the evidentiary error, but the FARBAD Act evidentiary errors that you assert would certainly matter. But why does the Pickering or Mt. Healthy analysis matter? Well, Your Honor, if you approach it from that direction, it doesn't matter. I mean, ultimately, if you take the position, well, so what if there were errors if the jury found there was no retaliation? Who cares? I agree. All right? So the FARBAD Act has become the real meat of the coconut, right? I believe it does. And how do you get there? And I think there's a couple of ways to get there. Given the recent Obrey decision, I think it changes the analysis in terms of the presumption of prejudice. And I believe given the recent Obrey decision, there is a presumption of prejudice here that isn't rebutted. But I also believe there's an important issue in terms of how did the court get there to allow this? I mean, I've never seen a case with so much character, unseemly. Were you the trial lawyer? Yes, I was. Didn't you elicit much of it? I did elicit much of it because my motion in limine to preclude it was denied. And like, I believe, most good trial attorneys, I was attempting to diffuse it. And there's Ninth Circuit law on points that I've cited that indicates that the invited error doctrine does not apply when a motion in limine has been denied. And I was simply attempting to diffuse some of the character evidence I was anticipating. There was other evidence I didn't know it was coming and just came out of left field, which I'm sure I would have, you know, attempted to either diffuse or take further steps to ask the court to exclude it. But I was in the unenviable position of any trial attorney once you've made a motion in limine to exclude evidence, character evidence, prior bad act evidence. When you know some of it, you may not know what all of it is, but at least what you know about, you make a tactical decision as a trial attorney. Am I going to try to diffuse it or am I just going to sit back and ignore it and let the jury hear it for the first time through the defendant? And from my opinion as a trial attorney, nine out of ten times, I believe the best practice is attempt to diffuse it. Otherwise, it looks like you're trying to ignore it or you're afraid of it, and it has a greater, more harmful effect. In fact, you know, my experience in state court where I can allow it to do more voir dire, if I know it's coming in, I will jump right there and voir dire. I won't even wait until I get to examining witnesses. I mean, I've had cases where I've told juries, you know, my client's this bad person. He did A, B, and C. You're probably not going to like him. Do you think you can give him a fair trial? I mean, it seems to me if you... I agree that's a very good strategy. So maybe we should talk about why the district court judge denied your motions in Lumley, and doesn't that go back to Mount Healthy? I believe it does primarily, yes, which is why I want to get to Mount Healthy because I believe his reasoning was that the intent of persons who were participating in the retaliatory acts that culminated in my client's termination, that somehow because their issue of intent was at stake, that they should be able to defend themselves by saying, well, one of the reasons I was making efforts to get her disciplined or get her terminated in this case, my client's termination really culminated in two meetings with the director, with Mr. Terhune, who was new director. He was kind of new on the scene. He didn't know my client's history. When he initially looked at the adverse action package, the documentary evidence supporting her termination, his initial reaction was not to terminate her but to demote her because he knew that she hadn't had any experience or training in conducting investigations. This was the first one she had ever done. She had wanted to get... Was experience and training and doing an investigation necessary in order to present a truthful report? Well, the answer to that obviously is no, it isn't. If you're truthful, you're truthful. That wasn't the issue, was it? Well, I believe it was, Your Honor, and let me explain why. We're kind of digressing, but I would like to address your point. My client was asked to investigate whether state vehicles were being misused, were being used for private or personal non-business reasons. Given her tenure with the company, how much training could you need in order to investigate something as straightforward as that? Well, let me explain what happened. The simple thing she needed to do was look at mileage logs, which is one of the things she did, and she determined from looking at mileage logs that two individuals were using state vehicles almost on a daily basis to commute to and from work. In fact, one of them, the excuse was, well, they're being vandalized, and we need to drive them away from this state parking lot because they're being vandalized. One of these individuals left his own personal car in that parking lot, which could be vandalized, and drove a state vehicle back and forth. Now, she did that. If she had had experience, she could have stopped her investigation right there and just simply said, here's my report. I've looked at the mileage logs. According to the mileage logs, it appears that they're using these cars on basically a daily basis to commute back and forth. She did more than she needed to do, and she interviewed a bunch of people. She interviewed a lot of people who were potential witnesses.  How often did you see them driving the car? And she took taped statements, but she didn't have the resources to have them transcribed, and she was being rushed and pushed to hurry up and finish your report. She was given this deadline, hurry up and finish your report. We need it, we need it, we need it. In her rush and in her haste, and without having the resources to have these tapes transcribed, from her recollection and from her notes, she wrote a report that inaccurately summarized what some people told her. It didn't matter whether somebody told her, I see them using it every day or often, and what she did is from her notes and her memory, she mischaracterized not 100%, and she had no motive to lie about it. It didn't matter whether somebody said, I see them using it often, frequently, daily, once in a while, whatever. Whatever these people said at the end of the day, it didn't matter, because the fact... But the jury heard all this and found specifically that it was false, it contained false statements. Yes, and now we're getting back to the issue of prejudice and bias when it goes to credibility. And the jury had to decide an issue. Did my client, you know, what was her character? Here's a woman who, from 1967 to 1992, before she was put into Region 2 and working for Mr. Peralta, African-American woman who had an unblemished career with the State of California, who had worked with the Employment Development Department, had been recruited by the Department of Corrections, had numerous promotions, had no warts, no discipline, no complaints, an incredible record when you think about it, from a black woman, an African-American woman from 1967 to 1992 to be with state agencies and to become the highest-ranking woman in the Department of Corrections in the late 80s and early 90s. I mean, this just wasn't, you know, just another person. This woman had a track record. And if you look at that track record and then look at the cauldron that she was put into when she got to Region 1 and all the bickering and the fighting that was going on there, whether you want to call it political, personal, racial, whatever it was, it wasn't a pretty picture. And within that context, she was rushed to do an investigation. You know, she was the only person, the evidence was undisputed at trial, the only person the department had ever investigated who had done an investigation. The normal practice was, and this is testimony from Mr. Guyton and from Mr. Bollinger, that normal practice was if an investigator prepared a complaint that appeared to need revisions, amendments, modifications, what have you, that report would be kicked back to the investigator to make revisions. And what often happened, my client didn't have the benefit of it, is you would have the transcripts made of the taped interviews and you could look at the transcript of the taped interviews. Yes, in a perfect world, my client, if she'd had the time, it would have been nice to be able to sit around, listen to the tapes, and try to make a more accurate report. But the issue really comes down to she had no motive to lie. In fact, she had a motive to say that the vehicles weren't being misused because under state law, the people who were misusing the vehicles, including their supervisors, could have been charged financially, economically. She could have come out of pocket, potentially, for the misuse of these vehicles, which were individuals within her chain of command. So at the end of the day, it seems to me there was a – if you take away the character evidence and the bias and the prejudices and painting her as some just terrible ogre, you know, someone who's been accused of thievery and wanting to send dog feces to people and, I mean, you name it. I mean, if you paint a picture of a person like that and then you ask a jury to decide what otherwise I believe is a close question, and that is, was this just an innocent mistake? Was this somebody who was rushing and somebody who wasn't trained to put a report together that, yes, maybe it misquoted what some people told her. Maybe it was not technically totally accurate. But the conclusion was accurate. The result was accurate. Yes, these individuals were using state cars on virtually a daily basis to commute to and from work. And what was interesting, during her investigation, they were told to stop it. And then the department came out with a new written policy or just clarification. You can't use these cars to commute anymore. And this happened right in the middle of her investigation. And so it seems to me, Your Honor, that if Mr. Trujillo, the director, looked at this and thought, geez, she didn't have training, this may have been just kind of more of an innocent mistake as opposed to an intentional effort to lie when there's no motive to lie. And the fact is, yes, these vehicles were being improperly used, at least from the point of view of what the law is. But this sounds like a fine argument, closing argument to a jury. But that was done. Those same statements must have been made to this jury. They were. That jury must have taken into consideration not only her prior bad act, but character evidence goes both ways. She must have presented some evidence of her good reputation in the workplace. And a decision was made by that jury with respect to whether or not this was in retaliation or a violation of law or a proper termination. And so I'm not hearing yet a sufficient basis for us to overturn that decision. Well, all I can say, Your Honor, is you're representing a person who, and this is all of the evidence, and now all of a sudden evidence that I believe shouldn't have been admitted that comes in that says, well, I heard from another person that your client asked somebody to bring in dog feces so I can send it to somebody in a candy box. Oh, I heard that your client was involved in shoplifting. Oh, I heard that your client was being threatening and verbally assaultive to a co-employee. Oh, I heard that your client made inappropriate, acted inappropriately in a court proceeding that had to do with her son being shot. But the idea being that she was unprofessional, inappropriate in a court proceeding. Now, all of a sudden evidence that a jury should not have heard about my client is heard. And how do you unring that bell? I mean, I ask you, if your client has been accused of shoplifting, of asking somebody to bring dog feces so she can send it to someone she believes is dating her husband, I mean, things of that, how do you put that out of your mind? How can you say that's not prejudicial? I mean, as a trial lawyer, I know how much, when I'm in trial with other sides, how much incredible effort is gone through motions and limine to keep out sometimes what seems somewhat innocuous evidence as being unduly prejudicial. And I submit to you, as a trial judge, judge where? I mean, you're familiar with motions and limine where parties come in and say, you can't let in my drunk driving conviction. Or you can't bring in that I was arrested or convicted for marijuana possession because I can't get a fair trial. And I'm going to be unduly prejudiced if the jury hears I was convicted of drunk driving or of marijuana possession or of beating my wife or of shoplifting. I mean, this happens every day. And trial courts every day exclude that evidence as being unduly prejudicial because trial judges and trial attorneys know that juries are fickle, that juries oftentimes will be very influenced by character evidence, which is why we have Rule 404 there to begin with. I mean, the federal court, the rules recognize why is character evidence generally inadmissible and rarely admitted? And oftentimes when we get into a 404-B analysis over, well, you know, is there an exception to the rule here? Should we let in character evidence? Then 403 raises its head. Well, wait a minute. Isn't the prejudicial impact going to outweigh the probative value? And as a trial attorney, I'm very sensitive, and I know most trial attorneys are very sensitive to character evidence coming in because what does it do? It influences and prejudices juries. Okay. You might want to save time for it. Thank you. I would. Good morning. My name is Michael Sweeney. I'm with the California Attorney General's Office, and I represent the five appellees. Indeed, counsel did make those arguments before this jury, and after four weeks of hearing the evidence in this matter, the jury found against Ms. Briscoe King on the most basic elements of her case. The jury found that she was intentionally and recklessly dishonest in her speech and that there was no retaliation for that speech. I submit that there are four reasons that this appeal should be denied and the judgment affirmed. One, the jury did indeed find no retaliation. Appellant's opening brief does not challenge that finding in any respects whatsoever. Indeed, it doesn't even acknowledge that finding. Two, the invited heir doctrine applies in this case. Three, there is a significant waiver problem. Appellant waived any objection that she had to this evidence. And four, the speech at issue in this case, I submit, after conducting the Pickering balancing, is not protected speech. Appellant's opening brief never even mentions, refers to, or in any way suggests to this court that the jury found no retaliation. More importantly, appellant doesn't challenge that finding. Well, yes, but the part of the argument is that the court improperly, or the court abused its discretion by allowing in the Parabat-Axe evidence. And, of course, that would taint the jury findings. Let's jump to that issue. Arguably. Let's jump to that issue, Your Honor. I submit appellant has waived any objection to that evidence. The record before this Court does not contain an objection to the evidence that appellant now for the first time disputes. Because she has not done so, I submit she's waived any objection to that evidence. There was an objection to the dog evidence, I think. No, Your Honor, there is not. But there were the motions in Limoney. That motion in Limoney is not before this Court. It is not an excerpt of record. All we have is a one-sentence statement. We're really tired to look at the entire district court record. Sure. Your Honor, the significance of this is important. The motion in Limoney purported to keep out, quote, evidence of Parabat-Axe. We don't know the specific grounds for that objection. We don't know what specific evidence he's referring to. But what we do know ---- Well, Judge Carlton denied the motion in Limoney on the grounds that it was overbroad and said to object on an item-by-item basis, right? Sure. Not technically what the sentence says, the order, but I would surmise that's what Judge Carlton intended. Well, it's what he said. I'm referring to the explicit order written by the judge. If you're referring to trial testimony or trial statements, I suspect that's what he did say. But what's critical here is this. Because we don't have an attempt to proffer the evidence by me, an objection, and then a ruling, there's ambiguity as to why the evidence was proffered. What Appellant has done is they've set up a straw man and knocked down that straw man. What Appellant has suggested to this Court ---- I haven't studied the record, but was there any reference in opening statements to these matters? I don't recall. Because if you think about it, if you have rulings in Limoney and the Court says, I'm going to take it up later, lawyers often, anticipating what's coming into evidence, try and lay out the bad acts. And so I was wondering whether or not there's any reference to these prior bad acts in anticipation of them by plaintiff or defense at the trial level. I have not reviewed my opening statement. It's not ---- I don't believe it was actually transcribed. Your Honor, it's important to address something, though. The straw man that has been set up here is to suggest to this Court that that evidence was proffered and admitted related to the Mount Healthy defense. The record does not reflect that whatsoever. I submit to this Court I never proffered that evidence under Mount Healthy. I submit to this Court Judge Carlton did not admit that evidence under Mount Healthy. The critical distinction is this. There are two forms of speech in this case. Speech one was the Stockton report. Speech two was the speech as to race discrimination. What the record reflects is that appellant claimed that she accused defendant Peralta of racism in 95, 96, and 97, and that he engaged in this retaliatory conduct, and that's my evidence to show that he was out to get me. And there's a suggestion by counsel that he elicited and admitted this evidence to, quote, diffuse the prejudicial impact. That distorts the record significantly in this case. I direct your attention to pages 15 to 68 of the record. There are literally hundreds of questions asked regarding the exact evidence he now objects to. What appellant was developing was this. It was a suggestion explicit in the record that Henry Peralta, defendant Peralta, encouraged the military police to arrest Briscoe King and then attempted to wrongfully use that event to discipline Ms. Briscoe King. That's the evidence they developed to prove their prima facie case. One, that her speech as to race discrimination was truthful, and two, that defendant Peralta had a motive to retaliate against her for that speech. That's why the evidence was relevant. Peralta testified to explain why he was engaging in this conduct. He did take action against her. It was progressive discipline, and it was building over the years. A critical, a very critical point here is this. Defendant Peralta did not terminate Briscoe King. He was no longer her supervisor. The allegation against Peralta is not that he terminated Briscoe King. The allegation against Peralta is that essentially he started the ball rolling and soiled her career and that somehow damaged her in the eyes of the Department of Corrections because he served an adverse action against her in 95, that he served other counseling memos in 94 and 96, and that he was disappointing with her in early 97. Those are the allegations against Peralta. The evidence was relevant to explain Peralta's conduct. Why did I do that? Because I believe she was insubordinate. I believed she was dishonest. I believed she was failing to do her job duties. Why? Because these events occurred. Why did I take that action? Because of this event. That's why that evidence was relevant. It was not proffered. The record in no way reflects that I proffered this evidence under Mount Healthy or that Judge Carlton admitted it under Mount Healthy. They have not – they have set up a straw man and knocked it down, but that is not the basis for this evidence. I submit that evidence was directly relevant to Plaintiff's prima facie case, and there was no abuse of discretion in that evidence being admitted into evidence. Now, with respect to the issue of waiver, the subtlety of this may seem trivial, but it is significant. We do not know what the actual objection is. And since the standard of review is was there an abuse of discretion, that's – that's what's reviewed here. What objection was asserted, and what was the district court's ruling on that objection? I submit there's been a waiver. Additionally, given the fact that Appellant extensively elicited, developed, and used this evidence as a sword, certainly the invited-error doctrine applies. Now, I read the points and authorities submitted by Appellant in her reply brief asserting that the invited-error doctrine does not apply in a civil case. I could not find a single case that stood for that proposition. In fact, I found cases that applied the Aller v. United States decision in a civil context, and indeed found it in the context of a civil rights plaintiff. I'll bet from other circuits. But I did not find one case that suggested that the U.S. Supreme Court's decision in Aller is limited to a criminal defendant. Your Honors, what should not be lost in this case, however, is the fact that the speech at issue here is not protected speech under the First Amendment. I submit there's two reasons. First, the speech that we're dealing with is – is not a matter of public concern. And second, it's after conducting the Pickering balancing, the interest of the State as an employer far outweigh the interest of Briscoe King as an employee. I think we're going to hear from the Supreme Court relatively soon on that first point, what touches – what touches on a matter of public concern. I would agree with that. If I may direct your attention to something, there's an argument about what the speech says and what the speech actually says. Because what the speech actually says I think is slightly different than the argument as to what the speech says. And the critical point here is this. Ms. Briscoe King was requested to collect fact only. Interview some witnesses, look at some documents, report fact back to us regarding your immediate subordinates. She was not asked for an opinion. She was not asked for her judgment. Just go collect fact. And keep in mind, she's a peace officer. This was a confidential internal report to be used to potentially discipline her subordinates. Her report purports to report fact. It does not purport to report judgment or opinion or anything other than that her report speak for themselves. Let me digress for one moment. The jury did find unambiguously that she was intentionally false in that report in substantial and material ways. For the first time in this case, appellant has taken the position that there is only one sentence that is the matter of public concern. That's the first time in this case that that position has been taken. It was not taken at the trial court level. It was not argued to the jury. The first time that has occurred is here on appeal. I submit that's a deceptive way of bypassing the substantial evidence rule, because the jury heard all the evidence. They saw the transcripts. They heard witnesses speak. They reviewed the report. They heard other circumstantial evidence. They concluded that Ms. Briscoe was intentionally false in substantial and material ways. Now, if, although he didn't, if appellant had argued that there's only one sentence here that's material, then the jury addressed that and concluded she was intentionally false in that one sentence. If they're making that argument for the first time on appeal, I submit that's been waived, and the jury verdict stands with respect to that finding. Now, transitioning to the issue of the Pickering balancing, I want to break out the two forms of speeches and begin with the Stockton report. I'm not sure if there's ever a situation where intentionally false speech can ever be protected speech under the First Amendment. But assuming hypothetically that it can, in the context of the Pickering balancing, I submit that the interest of the State as an employer vastly far outweigh the interest of the employee to engage in intentionally false speech, especially given the context of this speech. Again, she was requested to collect fact, an internal investigation regarding her subordinates, report back those facts. She purports to report fact. There is no reasonable interpretation of that report that she is reporting opinion or judgment or anything similar. You know, I was somewhat confused by the investigation itself because it started as an investigation of whether or not the private use of the government-owned vehicles was occurring. And at the end of the day, it sounded as though the policy permitted such use if certain circumstances were present, which seem to be present here, namely going to and from work and assignments that would have to take place first time during the day. And it seemed as though that would be a policy, of course, that would be known by those who asked her to do the report or part of the assignment. In other words, there are certain circumstances where people can use their private vehicles, figure out whether or not they're abusing that, as opposed to figure out whether they're using it for private use. Do you understand? I do understand. And, indeed, there was three to seven days of testimony on this topic alone. A great deal of testimony was on this topic. Persons who were long-term employees of the parole division were well aware that there was a well-established policy that parole division offices don't leave state vehicles in the parking lot. They're located in terrible neighborhoods, frankly. They're subject to vandalism and theft. And that the supervisors in the office were directed, encouraged to drive those vehicles home at nighttime. Ms. Briscoe Keene had been given the explicit instruction to go investigate, to drive cars strictly within that policy. That was the parameters of her charge. Ensure that they're driving it within the parameters of that policy, or if they're not, what's the other circumstances? She produced a report, and the record reflects that people who were in the know, such as Defendant Peralta and others, were incredibly confused by her report. It, frankly, didn't make sense to them, because it didn't measure the policy and measure the conduct and whether the conduct fit within the policy. It was very confusing to them. It didn't answer the charge that she had been given. And it was a repetition of what witnesses had said regarding or purports to be a representation of what witnesses had said regarding the use of those vehicles. Significantly, that report, coming from high above at the CDC, directed that some action be taken against those employees, based on Ms. Briscoe Keene's report. The Employee Relations Officer commenced preparation of those adverse actions. They were going to be disciplined, based on Briscoe Keene's report. When the Employee Relations Officer was compiling the data, they were going to be disciplined. She discovered repeated lies, significant and exonerating omissions, and, indeed, lies were stated to witnesses. And the jury heard all this. There was probably a week of testimony on this. Ms. Briscoe Keene's report ended up, as the jury concluded, she was false in substantial and material ways, and the jury concluded that was intentional. Returning to the Pickering balancing, given that finding by the jury and all the other factors that this is a report regarding her subordinates, the actual disruption, I submit that the interest of the State as an employer greatly outweigh Ms. Briscoe Keene's interest in free speech in that context. The same analysis I submit applies in the context of the speech as to race discrimination. What the record actually reflects is every time Mr. Peralta attempted to supervise this very difficult employee, Ms. Briscoe Keene accused him of racism, despite no evidence whatsoever of racial bias. A simple example is this. Mr. Peralta was very disappointed that he had to have Ms. Briscoe Keene. He felt she had been dumped on him. Ms. Briscoe Keene accused him of racism because of his attitude towards that dumping. What the record actually reflected was he had been grooming an employee for years to take that position. That employee was Bonnie Long Oliver, who is African-American. He wanted that employee in that position who had been grooming and had been in the parole division for decades. Ms. Briscoe Keene, who came from the institution side of the department, he felt had been dumped on him. Despite the knowledge that that was his chosen successor, Ms. Briscoe Keene accused him of racism. And there's numerous other examples of that without any evidence of bias, of actual bias by Mr. Peralta. The consequence of these repeatedly recklessly false accusations against Mr. Peralta was he literally gave up supervising Ms. Briscoe Keene. And there was witness after witness testified that there was a bias in Ms. Briscoe Keene as a consequence. I submit under Pickering, the interest of the State as an employer vastly outweighed the interest of Mr. Briscoe Keene on this topic. And I submit on that, Your Honor. Kagan. Thank you, Mr. Sweeney. Mr. Scott. The first thing I'd like to remind the Court is the State or the Attorney General apparently concedes that the evidence was extremely prejudicial. He's not suggesting or implying to this Court that the evidence that was introduced, which he claims was not because of my unhealthy and which he claims I was using as a sword, was not prejudicial. The argument seems to be that it's my fault that it came in. I only have myself to blame. It's not against the law for evidence to be prejudicial, though. I mean, some of the most prejudicial evidence is a little more than that. That's prejudicial. But it's only if it's improper that's the issue. Yes. And I don't think he's arguing that it was proper. It's the argument, seems to me, I brought it on myself. I'd like to just point to some things in the record, and this is of the excerpts of record, page 51, reading from the order on the motion to eliminate. Quote, Plaintiff's fifth motion to eliminate seeks to exclude any evidence relating to prior bad acts which were not included in the notice of adverse action, which gets us right smack dab into Mount Healthy, because the Mount Healthy argument is if it's not in the notice of adverse action, then it's not, you know, you can't argue I would have if you can't cut through the could-have test. And in order for it to be could-have, it would have to be in the notice of adverse action. Number two, in the opening brief at page 32, we quote extensively from part of the record when this issue came up during trial. And it's all about Mount Healthy. And this is Judge Carlton saying that when he says, I know I've ruled in your favor on this issue, and he's referring to excluding prior bad acts and eliminate, but this is a bit more problematic perhaps than I appreciated at the time. And then he talks about the specific adverse action. Well, he notes that although the specific adverse action that she complained of was the discharge, we were just here over the discharge. We weren't litigating anything that happened with her and Peralta back in 93, 94, 95. This lawsuit was only about the discharge. You quite properly pointed out these individual defendants may not have been in any we're not responsible for when it went into the notice. But then he said, but that doesn't get us to a Mount Healthy problem. And then he goes and talks about the Mount Healthy issue. And on the following day in the morning, we're talking about in the transcript at pages 366 to 376, it was all about Mount Healthy. So to suggest that somehow this wasn't related to my motion to eliminate or to the Mount Healthy discussion, I think it's simply wrong. Mr. Scott, you're way over time. Two quick points, if I can. You really are way over time, and we've read the briefs very thoroughly, so I think we have a good understanding of your position. Thank you. Thank you both. The matter just argued will be submitted, and the Court will stand in recess for the day.
judges: Rymer, Wardlaw, Ware